**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| DEBJANI PANDA | Civil Action No.:   1:22-cv-6869 |
| Plaintiff, | |
| | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| GUARDHAT, INC. and PRAVEER KUMAR, in both his individual and professional capacities | |
| Defendant. | |

Plaintiff Debjani Panda ("Plaintiff"), by and through her attorneys, Faruqi & Faruqi, LLP, hereby alleges as follows against Defendants Guardhat, Inc. ("Guardhat" or the "Company") and Praveer Kumar ("Kumar") (together, "Defendants"):

**<u>NATURE OF THE CLAIMS</u>**

1.      As one of its core values, Guardhat urges its employees to "communicate fearlessly."

2.      However, as Plaintiff learned after roughly a year at the Company, this is nothing more than hollow corporate branding—in truth, gender discrimination is endemic at Guardhat, and employees who "communicate fearlessly" about this reality are subjected to swift retaliation.

3.      Plaintiff's first year at Guardhat was marked by myriad successes, including praise from countless colleagues, multiple increases to her salary, the doubling of her bonus target, and her receipt of 100,000 additional stock options (on top of those offered to her initially).

4.      Plaintiff was poised to continue on her meteoric trajectory; however, everything changed when Guardhat hired Kumar.

5.      After interacting with Plaintiff for no more than a few minutes, Kumar told her he had decided that she was "not a team player" and treated her with open hostility.

6. When Plaintiff complained that Kumar's assessment was motivated by gender bias, Defendants made sure that her continued employment at Guardhat would be short-lived.

7. Over the course of a few short months following Plaintiff's protected complaint, Defendants did everything they could to set her up to fail, culminating in the discriminatory and retaliatory termination of her employment in April 2022.

8. Despite issuing her male peer a performance improvement plan and allowing him an opportunity to improve around the same time, Defendants swiftly fired Plaintiff without warning, offering nothing in the way of explanation, apart from bald, unexplained critiques that she purportedly lacked "strategic thinking" and "technical expertise."

9. Weeks later, Defendants shifted their rationales for the transparently unlawful firing by offering four new reasons, which ranged from false to entirely implausible.

10. Worse yet, when a Guardhat executive offered Plaintiff a job elsewhere in the Company, Defendants caused the offer to be rescinded a week later, sending a clear message that Plaintiff was *persona non grata* not only within Kumar's team, but anywhere at Guardhat due to her protected activities.

11. Finally, throughout Plaintiff's employment, Defendants paid her considerably less than her similarly situated male peer, despite their performing jobs of equal skill, effort, and responsibility.

12. To redress these wrongs, Plaintiff brings claims for violations of: (i) the Fair Labor Standards Act, as amended by the Equal Pay Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"); and (ii) the Illinois Equal Pay Act, 820 Ill. Comp. Stat. §§ 112/1, *et seq.* (the "IEPA").

## JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiff's rights under the FLSA.

14.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's claims arising under State and local law.

15.     Pursuant to 28 U.S.C. § 1391, venue is proper because Guardhat maintains a place of business is located in this District and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## ADMINISTRATIVE PREREQUISITES

16.     Contemporaneously with the filing of this action, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging, *inter alia*, discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").

17.     Contemporaneously with the filing of this action, Plaintiff filed a Charge of Discrimination with the Illinois Department of Human Rights ("IDHR") alleging, *inter alia*, discrimination and retaliation in violation of the Illinois Human Rights Act, 775 Ill. Comp. Stat. §§ 5/1-101, *et seq.* (the "IHRA").

18.     Upon receipt of a Notice of Right to Sue and being released from the jurisdiction of the IDHR, Plaintiff intends to seek leave to amend her Complaint to add, *inter alia*, claims for discrimination and retaliation in violation of Title VII and the IHRA.

19.     Any and all other prerequisites to the filing this action have been met.

3

## PARTIES

**A.**     **Plaintiff Debjani Panda**

20.    Plaintiff is a resident of the State of Texas and was employed by Defendants in Guardhat's Detroit, Michigan office from on or around January 25, 2021 through on or around May 13, 2022.

21.    At all relevant times, Plaintiff was an "employee" of Defendant within the meaning of all relevant statutes and regulations.

**B.**     **Defendant Guardhat, Inc.**

22.    Guardhat is a foreign corporation with its principal place of business and sole corporate office located at 6001 Cass Avenue, Detroit, Michigan 48202.

23.    Guardhat also maintains an office at One Oakbrook Terrace, Suite 510, Oakbrook Terrace, Illinois 60181.

24.    At all relevant times, Guardhat controlled and directed the terms and conditions of Plaintiff's employment.

25.    At all relevant times, Guardhat established, implemented, disseminated, and controlled the employment policies applicable to Plaintiff, including, *inter alia*, timekeeping, work allocation, task supervision, monitoring work product, and payroll.

26.    At all relevant times, Guardhat maintained and exercised the power to hire, fire, discipline, and promote Plaintiff.

27.    At all relevant times, Guardhat was Plaintiff's "employer" within the meaning of all relevant statutes and regulations.

C.      **Defendant Praveer Kumar**

28.      Kumar is a resident of the State of California and has been employed by Defendant from in or around January 2022 through the present.

29.      At all relevant times, Kumar established, implemented, disseminated, and controlled the employment policies applicable to Plaintiff, including, *inter alia*, timekeeping, work allocation, task supervision, monitoring work product, and payroll.

30.      At all relevant times, Kumar maintained and exercised the power to hire, fire, discipline, and promote Plaintiff.

31.      At all relevant times, Kumar was Plaintiff's "employer" within the meaning of all relevant statutes and regulations.

## FACTS

A.      **Background**

32.      Guardhat hired Plaintiff on or around January 25, 2021 as a Senior Director of Solutions Engineering.

33.      While Plaintiff resides in Texas, she interfaced with employees in Illinois on a regular basis, and attended meetings at Guardhat's Illinois office.

34.      Soon thereafter, Plaintiff was promoted to the role of Senior Director of Product Management and Ecosystems.

35.      In this role, Plaintiff took on additional responsibilities and served dual internal and external roles—an unmistakable testament to her capabilities and value to the Company.

36.      Indeed, in addition to playing a critical role in developing Guardhat's products, Plaintiff also carried out customer-facing job functions as a pioneer of Guardhat's product ecosystem.

37.     She excelled in both roles by any measure.

38.     Plaintiff's strong performance is evidenced not only by stellar performance reviews and glowing feedback from her colleagues, but also her receipt of regular salary raises and additional stock options, as well as a significant increase to her incentive bonus target.

39.     Specifically, in May 2021, approximately five months after Plaintiff was hired, Guardhat raised her salary by $7,000 and granted her 5,000 additional stock options.

40.     In October 2021, Guardhat raised her salary again by an additional $33,000, doubled her bonus target, and granted her 95,000 additional stock options.

41.     Plaintiff's compensation history—in particular, Guardhat's decision to significantly raise her overall compensation twice in the span of less than a year—renders her performance record beyond reproach and belies any suggestion that her work was anything less than exceptional.

B.     **Kumar Reveals His Discriminatory Animus Almost Immediately After Meeting Plaintiff**

42.     As Senior Director of Product Management and Ecosystems, Plaintiff reported directly to Nirmal Chudgar ("Chudgar"), Guardhat's then-Chief Product Officer.

43.     In or around January 2022, Defendant hired Kumar as President of Product, Engineering, and Operations.

44.     Beginning in or around January 2022 up until her unlawful termination, Plaintiff reported indirectly to Kumar.

45.     On or around January 24, 2022, Plaintiff attended a daily stand-up meeting, where Kumar was in attendance.

46.     Unbeknownst to Plaintiff, Guardhat's Engineering Program Director, who typically presented objectives at stand-up meetings, had resigned.

6

47.    Chudgar told Kumar that Plaintiff would present first-quarter objectives for the Engineering Product team and do so at all future stand-up meetings until a new Engineering Program Director was hired.

48.    However, Chudgar never told Plaintiff of her new responsibilities prior to the January 24, 2022 meeting.

49.    Chudgar had also told Kumar that Plaintiff would take notes during and prepare minutes for this and all future stand-up meetings—again, unbeknownst to Plaintiff.

50.    When Plaintiff arrived at the meeting, she was caught off guard when Kumar asked her to present and lead the meeting, though she happily agreed to do so.

51.    Given that Guardhat's Engineering Program Director was not in attendance, Plaintiff assumed he was running late and that she was merely being asked to fill in for him until he arrived, as she was not aware that he had resigned.

52.    However, the Engineering Program Director never showed up, resulting in Plaintiff leading the entire meeting.

53.    When the meeting ended, Kumar advised Plaintiff that she would present and prepare minutes for all stand-up meetings going forward.

54.    Plaintiff was understandably confused, as Chudgar had never told her she would be presenting at or preparing minutes for the meeting (let alone all stand-up meetings) and doing so had never been one of her job responsibilities.

55.    Accordingly, she asked Kumar if they could discuss the issue privately.

56.    Shortly after the meeting ended, Chudgar advised Plaintiff that Kumar apparently felt that she had been rude to him.

57.    Plaintiff was dumbfounded.

58.     Having only exchanged a few short words with Kumar, Plaintiff had no idea how she could have possibly offended him during their brief conversation.

59.     During the same phone call, Chudgar also apologized for forgetting to tell Plaintiff that she should be prepared to present at and draft minutes for the January 24, 2022 meeting and all future stand-up meetings.

60.     Having now been made aware of Chudgar's communication error, Plaintiff was eager to clear the air with Kumar.

61.     Plaintiff contacted Kumar twice over the next two days, but he ignored her.

62.     Accordingly, when Plaintiff saw Kumar at the next stand-up meeting, she asked to meet with him separately.

63.     When they finally met, Plaintiff explained the miscommunication and told Kumar she would be happy to lead stand-up meetings going forward—she was just taken aback by his initial request.

64.     Kumar rudely responded, "I know you're not a team player."

65.     This response was telling.

66.     First, Kumar did not acknowledge Ms. Panda's explanation that her supervisor did not tell her she would be leading the meeting (which she agreed to do on the spot anyway), nor did he acknowledge her willingness to lead all future meetings, just as Mr. Kumar had requested.

67.     Moreover, Plaintiff had spoken with Kumar only twice before this meeting, and neither exchange lasted more than a few minutes.

68.     Kumar had no legitimate, non-discriminatory basis to believe Plaintiff was "not a team player."

C.    **Plaintiff's Protected Complaint**

69.    After this most recent exchange with Kumar, it became clear to Plaintiff that Kumar expected female subordinates to follow his directives blindly.

70.    To Kumar, Plaintiff's innocuous request to speak privately before agreeing to lead future team meetings was unacceptable from a woman.

71.    Simply put, Kumar would have never reprimanded a male employee or jumped to the conclusion that the male employee was "not a team player" merely because he was thrown off by an unexpected request to lead stand-up meetings, as Kumar did with Plaintiff.

72.    Over the following days (and months thereafter), Plaintiff noticed that Kumar spoke to male and female subordinates very differently, thus further supporting her belief Mr. Kumar harbored gender bias against her.

73.    While men were encouraged to speak up and offer constructive criticism, the few women who Guardhat employs were criticized for doing so.

74.    As a result, multiple Guardhat employees (both male and female) have described the Company as a "boys' club."

75.    In a sense, this is unsurprising.

76.    Indeed, as of Plaintiff's termination, Guardhat employed only three women other than her.

77.    Shortly after the January 24, 2022 stand-up meeting and again after her subsequent conversation with Kumar, Plaintiff spoke with Carolina Madrid ("Madrid"), Guardhat's Chief of Staff—and *de facto* head of Human Resources ("HR"), as the Company had no formal HR department—to seek guidance regarding Kumar's hostility toward her.

78.     On February 2, 2022, Plaintiff sent Madrid a detailed email summarizing her interactions with Kumar.

79.     At the end of her note, Plaintiff wrote in no uncertain terms that Kumar's behavior "demonstrates gender bias . . . and harassment."

80.     Plaintiff also expressed concern that Kumar would retaliate against her for her protected complaint, including by issuing her an adverse performance evaluation and/or limiting her opportunities for career growth.

81.     In retrospect, Plaintiff's stated fear of reprisal was prescient.

82.     Unfortunately, she was spot-on about what the next few months would entail.

83.     Plaintiff never received a response to her email.

**D.    Retaliation against Plaintiff and Defendants' Transparent Effort to Manufacture Pretext for Her Unlawful Termination**

84.     On or around March 10, 2022, approximately one month after Plaintiff's protected complaint, Kumar directed Plaintiff to work on a products requirements document ("PRD") to be completed by the end of March.

85.     Plaintiff cancelled her previously scheduled and approved vacation to complete this project—something only a "team player" would do, though this was unsurprisingly lost on Defendants.

86.     Over the ensuing weeks, Plaintiff felt a shift in Kumar's and Chudgar's disposition towards her, confirming her fears of retaliation.

87.     As such, she was careful to confirm via email the precise criteria for the PRD to make sure the finished product met Kumar's expectations.

88.    Despite Plaintiff's outlining of clear deliverables and her repeated requests for clarification as to exactly what Kumar and Chudgar wanted the PRD to include, they kept their responses ambiguous, seemingly intentionally.

89.    At this point, it was readily apparent to Plaintiff that Defendants were trying to set her up to fail.

90.    During two brief, subsequent meetings about the PRD, Chudgar told Plaintiff she lacked "strategic thinking and technical expertise."

91.    Tellingly, Chudgar refused to provide any further explanation when Plaintiff asked him to elaborate on his vague critiques.

92.    Further, it was readily apparent to Plaintiff that Chudgar's non-specific critique had been fed to him by Kumar, who did not wish to have this conversation with Plaintiff directly— both due to his unjustified disdain for her, as well as in an obvious attempt to avoid getting his hands dirty.

93.    Still holding onto hope that Defendants could see past her gender and protected activities to recognize her value to Guardhat, Plaintiff told Kumar and Chudgar that, if they told her what Kumar wanted, she would get it done.

94.    For example, Plaintiff asked them to provide instructions regarding the scope of the PRD and whether it should be based on a first-quarter or full-year targets, making clear that she was happy to craft the PRD in accordance with Kumar's specifications if he or Chudgar would simply provide them.

95.    Nevertheless, Kumar and Chudgar remained steadfast in their refusal to provide any meaningful direction, as they had clearly assigned Panda to work on the PRD for the sole purpose of creating pretext for her unlawful termination.

**E.**     <u>Retaliatory Termination of Plaintiff's Employment</u>

96.     On or around April 13, 2022, Defendants terminated Plaintiff's employment, effective May 13, 2022.

97.     To justify the transparently discriminatory and retaliatory decision, Guardhat claimed that Defendants were firing Plaintiff due to her supposed lack of "strategic thinking" and "technical expertise"—*i.e.*, the same baseless, bare bones, non-specific performance critiques offered by Chudgar roughly one month earlier.

98.     Chudgar directed Plaintiff to continue working on her assigned projects until her effective date of termination.

99.     However, as Chudgar instructed Plaintiff, she would no longer present a product demonstration at an all-hands conference in San Jose, California in April 2022, nor would she present at an upcoming Health and Safety Executive Conference in Amsterdam, as previously planned.

100.     On or around April 28, 2022, two weeks after Defendant informed Plaintiff of her termination, Madrid emailed Plaintiff with four additional reasons for her firing.

101.     Specifically, Madrid claimed that Guardhat fired Plaintiff for: (i) being "externally focused;" (ii) failing to meet expectations for the videoconferencing and devices list requirements of the PRD; (iii) a "lack of clarity and confusion" regarding the presentation of the worker condition monitoring component of the PRD; and (iv) failing to "write detailed requirements documents and communicate changes effectively across the team."

102.     All four reasons Guardhat provided are devoid of all merit and, in some cases, entirely in plausible, thus further revealing Defendants' unlawful motive.

103. First, in addition to having no relation to her "strategic thinking" or "technical expertise," Guardhat's claim that Plaintiff was too "externally focused" makes no sense in light of Plaintiff's job duties.

104. As Defendants are obviously aware, Plaintiff worked not only as Senior Director of Product Management, but also as Senior Director of Ecosystems—an externally facing role that required her to interface with customers.

105. Short of shirking her obligations to these customers entirely, it is unclear how Plaintiff could have stopped being "externally focused."

106. To be clear, however, Plaintiff afforded equal if not greater attention to her internally focused work, as evidenced by, *inter alia*, her strong performance on all internal assignments and her decision to cancel her pre-approved vacation to focus on the PRD.

107. Second, Guardhat cited Plaintiff's purported failure to meet expectations for the videoconferencing and devices list requirements of the PRD.

108. This rationale, too, is spurious to say the least.

109. Plaintiff completed all implementing and testing requirements for the PRD and did so on time.

110. As Defendants know full well, implementing the videoconferencing component required that Microsoft Teams (as well as Zoom and other third-party videoconferencing platforms) be integrated into the PRD.

111. Videoconferencing was not implemented on time for the sole reason that the Microsoft representative working with Guardhat and one of the Company's engineers had not completed the integration.

112.    Plaintiff is not an engineer had no control over this, as Defendants undoubtedly understood.

113.    Guardhat's reference to devices list requirements is even more puzzling, as it concerns a separate PRD on which Plaintiff never even worked.

114.    Third, Guardhat attempted to justify its transparently unlawful termination by noting that there was a "lack of clarity and confusion" in the presentation of the worker condition monitoring component of the PRD.

115.    The Company's claim that it fired Plaintiff for this reason is not just transparently pretextual, but also entirely in plausible.

116.    Indeed, this critique relates to a presentation in San Jose on April 20, 2022—a week after Ms. Panda was terminated—which Chudgar had specifically instructed Plaintiff not to attend when he notified her of her firing.

117.    Lastly, Guardhat claimed that Plaintiff failed to "write detail[ed] requirement documents and communicate changes effectively across the team."

118.    This strikingly non-specific critique is rebutted by Plaintiff's correspondence with Kumar and Chudgar regarding the PRD, as well as several emails and Slack messages from Plaintiff's colleagues specifically praising her detailed written work and effective communications skills.

119.    In short, Guardhat's stated reasons for Plaintiff's termination were transparently pretextual, post-hoc justifications for the unlawful decision to fire her.

120.    Moreover, the Company's shifting rationales for terminating Plaintiff's employment—*i.e.*, Guardhat's initially citing only a lack of "strategic thinking" and "technical

expertise," then later drumming up four new, unrelated, and transparently false reasons for the termination decision—in and of themselves evince the Company's unlawful motive.

**F.** **Additional Retaliation and Evidence of Unlawful Intent Following Plaintiff's Firing**

121.    Guardhat typically issues employees Performance Improvement Plans ("PIPs") before terminating their employment, thus allowing employees an opportunity to improve.

122.    Indeed, in or around March 2022, Defendants issued Employee A,[1] a male colleague on Plaintiff's team, a PIP setting forth benchmarks and a timeline for improvement, thus allowing him an opportunity to address any deficiencies in his performance.

123.    Plaintiff, on the other hand, was not issued a PIP.

124.    In fact, Plaintiff was not given any formal feedback on her performance prior to her termination, save for Chudgar's vague critiques that she lacked "strategic thinking" and "technical expertise," on which he refused to elaborate.

125.    The decision to issue a PIP to Employee A, while swiftly firing Plaintiff—without so much as a substantive explanation of her alleged performance deficiencies, much less a formal PIP—further reveals Defendants' discriminatory and retaliatory animus.

126.    Further, upon hearing of Ms. Panda's termination, Guardhat's Chief Growth Officer (the "CGO"),[2] reached out to Plaintiff to express his surprise and condolences.

127.    During a phone call on or around April 15, 2022, the CGO told Plaintiff that he wanted to bring her onto his team—ironically enough, because of her strong strategic thinking skills and technical expertise.

128.    In fact, the CGO was so eager to work with Plaintiff that he offered her the opportunity to put together her own job description, through which she would craft a role that best

---

[1] To preserve his privacy, Employee A's name has been replaced with a pseudonym.
[2] To preserve his privacy, the CGO's name has been replaced with a pseudonym.

utilized her skills and provided her with whatever opportunities for professional growth she wanted.

129. As the CGO excitedly told Plaintiff, they were "going to have a lot of fun making Guardhat successful."

130. However, less than a week later, the CGO told Plaintiff that he could no longer offer her the position.

131. It was readily apparent that the CGO had been advised that he was not permitted to hire Plaintiff because of her protected activities, thus resulting in a second adverse action against Plaintiff that prevented her from continuing her career at Guardhat.

132. Given that Plaintiff's work for the CGO would have been wholly separate from her work for Kumar, Guardhat's decision to rescind Plaintiff's job offer makes clear that Defendants were unwilling to keep Plaintiff in their employ not because of any issues with her work, but because she is a woman who complained of gender discrimination.

G. **Defendants' Unequal Pay Practices**

133. In addition to subjecting Plaintiff to discrimination and retaliation by, *inter alia*, terminating her employment and rescinding her subsequent job offer, Defendants also subjected Plaintiff to pay inequity as compared to her similarly situated male peer, Employee A.

134. Specifically, in or around April 2021, Defendants hired Employee A at a salary $80,000 higher than Plaintiff's salary.

135. While Plaintiff's salary was later raised to $7,000 per year, and again by an additional $33,000 per year, she was always paid considerably less than Employee A.

136. Indeed, even after Respondents raised Complainant's salary a second time, she was till paid at least $40,000 less than Employee A.

137.    Further, upon information and belief, after April 2021, Employee A received raises to his salary that render the pay disparity between him and Plaintiff even greater and even more indefensible.

138.    Upon information and belief, Employee A also received compensation greater than Plaintiff in the form of, *inter alia*, stock options and bonuses.

139.    Further, to incentivize Employee A to accept their job offer, Defendants sponsored his application to obtain a Permanent Resident Card (more commonly known as a "green card"), given that he is not a U.S. citizen.

140.    Guardhat paid several fees associated with the application on Employee A's behalf, in addition to covering the costs of his legal representation.

141.    Plaintiff received no such additional incentive compensation.

142.    The disparity between Plaintiff's and Employee A's compensation was not justified by a seniority system, merit system, or any factor other than sex.

143.    Similarly, it was not based on quantity or quality of production.

144.    Plaintiff and Employee A performed their jobs under similar working conditions.

145.    Plaintiff and Employee A performed jobs requiring equal qualifications, experience, and responsibility.

146.    In fact, Plaintiff and Employee A had the same job duties, with one exception: whereas Employee A was responsible for product management only, Plaintiff was responsible for both product management and ecosystems.

147.    In other words, to the extent their respective jobs did not require equal responsibility, Plaintiff's job required her to take on even more responsibility than Employee A.

148.     Moreover, Plaintiff has objectively greater experience and qualifications than Employee A., rendering the pay disparity especially unjustifiable.

149.     Indeed, Employee A has only 12 years of experience in Product Management, as compared to Plaintiff's nearly two decades in the field.

150.     Prior to joining Guardhat, Employee A had never taken a product to market and had little experience working with customers—which forced Plaintiff to train and mentor him throughout her employment, as well as often pick up the slack for his shortcomings.

151.     While Defendants assigned Employee A the title of Vice President ("VP") of Product Management, his job duties were nevertheless the same as Plaintiff's, even though Plaintiff was given the lesser title of Senior Director of Product Management and Ecosystems.

152.     Further, in or around the October 2021, Plaintiff met with Chudgar and Madrid at Guardhat's Oakbrook Terrace, Illinois office to discuss her title and the terms of her compensation following Guardhat's vesting her with additional responsibilities in Product Management.

153.     During this conversation, Plaintiff requested a VP title.

154.     Chudgar and Madrid acknowledged that Plaintiff would be performing all of the job duties and responsibilities as a VP, but nevertheless denied her request.

155.     As Chudgar and Madrid explained, job titles at Guardhat would soon be "re-leveled" as part of a corporate restructuring to ensure that job titles accurately reflected seniority and responsibilities.

156.     During the same meeting, Plaintiff also requested a salary increase of $63,000 per year, but was told that Guardhat could not raise her salary by any more than $33,000.

157.     Despite knowing she was being underpaid, Plaintiff reluctantly accepted.

18

158.　Moreover, Defendants never followed through on their promise to "re-level" Guardhat's corporate structure.

159.　In sum, Plaintiff performed equal (if not more difficult) work as compared to Employee A, yet her salary was lower than Employee A's by a wide margin.

160.　This is plainly inequitable.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF FLSA: UNEQUAL PAY BASED ON SEX**
***(Against Defendants)***

161.　Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

162.　During the full statutory period, Plaintiff was protected by the provisions of the FLSA, 29 U.S.C. §§ 201, *et seq.*, and all applicable regulations thereunder.

163.　During the full statutory period, Plaintiff performed equal work, under similar working conditions, on jobs requiring equal skill, effort, and responsibility as compared to her male comparator.

164.　Despite this, Defendants paid Plaintiff at a rate lower than that of her male comparator in violation of the FLSA, including, *inter alia*, 29 U.S.C. § 206(d).

165.　This pay differential was not the result of a seniority system, a merit system, any system which measures earnings by quantity or quality of production, or any factor other than sex.

166.　Defendants' unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the FLSA.

167.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the FLSA, Plaintiff is entitled to recover damages to the greatest extent permitted by law.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF THE IEPA: UNEQUAL PAY BASED ON SEX**
*(Against Defendants)*

168.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

169.    During the full statutory period, Plaintiff was protected by the provisions of the IEPA, 820 Ill. Comp. Stat. §§ 112/1, *et seq.*, and all applicable regulations thereunder.

170.    During the full statutory period, Plaintiff performed equal work, under similar working conditions, on jobs requiring equal skill, effort, and responsibility as compared to her male comparator.

171.    Despite this, Defendants paid Plaintiff at a rate lower than that of her male comparator in violation of the IEPA, including, *inter alia*, 820 Ill. Comp. Stat. §§ 112/10.

172.    This pay differential was not the result of a seniority system, a merit system, any system which measures earnings by quantity or quality of production, or any factor other than sex.

173.    Defendants' unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the IEPA

174.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the IEPA, Plaintiff is entitled to recover damages to the greatest extent permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.      Declare that the practices complained of herein are unlawful under applicable federal, State, and local law;

B.      Grant an injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.      Grant Plaintiff an award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate her for her economic damages;

D.      Grant Plaintiff an award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate her for all non-monetary and/or compensatory damages she has suffered, including, *inter alia*, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

E.      Grant Plaintiff an award of damages in an amount to be determined at trial, plus prejudgment interest, for any and all other monetary and/or non-monetary losses she has suffered;

F.      Grant Plaintiff an award of punitive damages in an amount to be determined at trial;

G.      Grant Plaintiff an award of liquidated damages in an amount to be determined at trial;

H.      Grant Plaintiff an award of reasonable attorneys' fees to the greatest extent permitted by law;

I.      Grant Plaintiff an award of reasonable costs that she has incurred in this action, including, *inter alia*, expert witness fees;

J.      Grant Plaintiff all other available damages to the greatest extent permitted by law; and

K.      Grant such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues of fact and damages.

Dated: December 7, 2022           **ST LEGAL GROUP**
        Deerfield, Illinois

                                  By: */s/ Diana Servos*
                                       Diana Servos

                                  1020 Milwaukee Avenue, Suite 335
                                  Deerfield, Illinois 60015
                                  Tel.: (847) 654-9200
                                  Fax: (847) 984-9698
                                  dservos@stlegalgroup.com


                                  **FARUQI & FARUQI, LLP**

                                  Alex J. Hartzband
                                  (*pro hac vice* to be submitted)
                                  Annabel R. Stanley
                                  (*pro hac vice* to be submitted)
                                  685 Third Avenue, 26th Floor
                                  New York, New York 10017
                                  Tel: 212-983-9330
                                  Fax: 212-983-9331
                                  ahartzband@faruqilaw.com
                                  astanley@faruqilaw.com

                                  *Attorneys for Plaintiff*